## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

**TAMI PATERSON,**
individually and on behalf
of all others similarly situated;

*Plaintiff,*

**v.**                                                          **Case No. _____**

**GENERALI U.S.
BRANCH; GENERALI
GLOBAL ASSISTANCE, INC.
D/B/A CSA TRAVEL PROTECTION**                 **JURY TRIAL DEMANDED**
**AND INSURANCE SERVICES; and
CUSTOMIZED SERVICES
ADMINISTRATORS, INC.;**

*Defendants.*

### PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

COMES NOW Plaintiff Tami Paterson ("Paterson" or "Plaintiff"), individually and on

behalf of all other similarly situated persons, against Defendants Generali U.S. Branch; Generali

Global Assistance, Inc. d/b/a CSA Travel Protection and Insurance Services, AKA/FKA

Customized Services Administrators, Inc. (collectively "Generali" or "Defendants"), and brings

this putative class action. In support thereof, Plaintiff makes the following allegations upon

personal knowledge of the facts pertaining to herself and on information and belief as to all other

matters, and states as follows:

### I. NATURE OF ACTION

This is a class action arising out of Defendants' acts and omissions amounting to a breach

of contractual duty, under the terms of travel insurance policies Defendants issued to Plaintiff.

1

Defendants contracted to indemnify Plaintiff and all others similarly situated for pecuniary and other losses and damages incurred as a result of covered events that prevented insureds from taking their planned trip. Plaintiff's claims, as well as the claims of each proposed class member, are supported by the written provisions of the Master Policy for travel protection insurance underwritten and administered to them by Defendants, Master Policy No. TMP10010 (the "Policy"). ***See* Exhibit A**, The Policy. The Policy, and all CSA Travel Protection Policies at issue for all other class members nationwide, is identified as "Policy Form series T001."[1]

1. Defendants have caused substantial harm to Plaintiff and the proposed class by improperly refusing to issue reimbursement for trip cancellations explicitly covered by the Policy. Plaintiff has been completely denied reimbursement for her Trip Cancellation Claim ("Claim"). Upon information and belief, Defendants have effectively adopted an approach to categorically issue denials to every Claim arising during the natural disaster that was brought on by COVID-19. Defendants refused to pay COVID-19 related trip cancellations by others insured under the Policy, whether said claimants submitted claims requesting indemnity for: (a) the Maximum Limit(s) Per Person or Plan for Trip Cancellation as listed on their respective Schedules of Benefits; (b) actual damages incurred due to trip cancellations; or (c) the price of the premiums initially paid by the insureds for Policies.

2. Plaintiff brings this action on behalf of herself and all other similarly situated individuals. Plaintiff seeks to recover compensatory, as well as declaratory and injunctive relief.

## II. PARTIES

3. Plaintiff Amy Flanigan is a citizen of the United States residing in the City of Copper Canyon in Denton County, Texas.

---

[1] See Exhibit A, The Policy, at *13.

4. Defendant Generali U.S. Branch (or "Generali U.S.") is a Maryland corporation with its principal place of business located in New York, New York. Generali Group is licensed to do business in all 50 states, Generali U.S. is engaged in the business of issuing insurance policies that are underwritten by Generali Group.

5. Defendant Generali Global Assistance, Inc. (or "GGA") is a New York corporation with its principal place of business in Bethesda, Maryland and branches in Alabama, Arizona, Florida, Georgia, Indiana, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nevada, New Mexico, North Dakota, Ohio, Pennsylvania, South Dakota, and West Virginia.

6. GGA is formerly and alternatively known as Customized Services Administrators, Inc. ("CSA"). CSA registered the trademark "CSA Travel Protection" in 2003.

7. CSA is an active California corporation with its principal place of business in California and branches in Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Hawaii, Indiana, Kentucky, Maine, Massachusetts, Minnesota, Missouri, Montana, New Mexico, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, Virginia, West Virginia, and Wyoming.

8. Five of the above-mentioned CSA branches are alternatively known as Generali Global Assistance and Insurance Services.[2]

9. Because of the unitary nature of Generali's businesses, all above-listed Defendant entities; Generali Group, Generali U.S., GGA, and CSA, shall hereinafter be referred to and treated collectively as "Generali" or "Defendants" unless addressed separately.

---

[2] 1 Arkansas, Hawaii, Indiana, Maine, and Utah.

10. Currently and at all times relevant herein, Generali, through its practices and relationships with its subsidiaries and alternate business names under which it carries out a vast majority of  its U.S. business, has consistently shown an existing unity of ownership, of operation, and of use sufficient to definitively establish the unitary nature of Generali's business.  Generali's operational unity is evidenced by central advertising, accounting, and management in the United States; further, Generali has demonstrated unity of use in its general system of operation.

11. For the foregoing reasons, all Defendant Generali entities can be said to maintain the same registered agent in Texas, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, who can be served at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

### III. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant; there are more than 100 members of the Class; and upon information and belief the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

13. This Court has general jurisdiction over Defendants because they have purposefully availed themselves of the benefits and protections of the state by conducting continuous and systematic business operations that are so substantial in this judicial district so as to render it essentially at home in this state. Generali Group underwrites insurance policies in the United States through Generali U.S. Branch. Generali U.S. is licensed to do business in the state of Texas and underwrites insurance policies to residents of this district. GGA conducts business under its fictitious business name, CSA, which administers plans to residents of this district.

4

CSA has an active branch located within the state of Texas and holds an active license with the Texas Department of Insurance.

14. This Court has specific jurisdiction over Defendant's United States entities; Generali U.S., GGA, and CSA, pursuant to Texas's long-arm statute. Generali, by and through its U.S. entities, does business in Texas by contracting with Policy purchasers to insure against risk and loss related in whole or in part to the state.

15. Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391 in that all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Eastern District of Texas.

## IV. FACTUAL BACKGROUND

16. On January 27, 2020, Plaintiff used the online vacation booking website VRBO.com to book accommodations for her niece's wedding in San Marcos, Texas. Plaintiff booked and paid, through VRBO.com, to reserve the vacation rental accommodations for herself and her husband during their planned stay. The trip was scheduled for April 3-5, 2020. ***See* Exhibit B**, VRBO Booking Confirmation (1.27.2020).

17. Plaintiff intended to travel by car to San Marcos.

## The COVID-19 Pandemic

18. On January 30, 2020, the World Health Organization quickly declared COVID-19 a "Global Health Emergency;" a "Public Health Emergency of International Concern," on the next day, the President declared COVID-19 a public health emergency.

19. On February 11, 2020, five days after the first coronavirus death in the U.S., the coronavirus was given its official name, COVID-19, by the World Health Organization.

20. CDC officials said it was the first quarantine order issued by the federal government in over 50 years.

21. On February 21, 2020, Dr. Nancy Messonnier, director of the CDC's National Center for Immunization and Respiratory Diseases, told reporters that U.S. health officials were preparing for the coronavirus to become a pandemic.[3]

22. On February 29, 2020, the U.S. government issued a "do not travel" warning and prohibited travel between the United States and several countries with COVID-19 outbreaks.

23. On March 4, The World Health Organization raised the mortality rate of coronavirus up to 3.4%. In comparison, the seasonal flu kills fewer than 1% of those infected.

24. The President issued the *President's Coronavirus Guidelines for America*, known also as the "30 Days to Slow the Spread" campaign, which called for Americans **to avoid social gatherings of more than 10 people for the next 15 days** and to **limit discretionary travel**, among other guidelines. The CDC had published a page on its official website dedicated to COVID-19, including links to additional CDC guidelines published in furtherance of the "stop the spread" initiative. Under the site's "Travel" drop-down tab, travel-specific informational pages were made available, such as one titled "Travel in the US." The page listed seven key inquiries to ask oneself "if you are thinking about traveling away from your local community:"

> **Is COVID-19 spreading where you're going?**
> You can get infected while traveling.
> **Is COVID-19 spreading in your community?**
> Even if you don't have symptoms, you can spread COVID-19 to others while traveling.
> **Will you or those you are traveling with be within 6 feet of others during or after your trip?**
> Being within 6 feet of others increases your chances of getting infected and infecting others.

---

[3]   https://www.usatoday.com/story/news/world/2020/02/21/coronavirus-who-contain-outbreak-iran-deaths-south-korea-cases/4829278002/

**Are you or those you are traveling with more likely to get very ill from COVID-19?**
Individuals who have an increased risk of severe illness from COVID-19 should limit their travel.
**Do you live with someone who is more likely to get very ill from COVID-19?**
If you get infected while traveling you can spread COVID-19 to loved ones when you return, even if you don't have symptoms.
**Does the state or local government where you live or at your destination require you to stay home for 14 days after traveling?**
Some state and local governments may require people who have recently traveled to stay home for 14 days.
**If you get sick with COVID-19, will you have to miss work or school?**
People with COVID-19 disease need to stay home until they are no longer considered infectious.[4]

25. On March 13, 2020, the President declared a "National Emergency," which he said freed up nearly $50 billion in additional disaster funding. The same day, Texas Governor Greg Abbott declared a "State of Disaster" in Texas.

     His order read:

> NOW, THEREFORE, I, GREG ABBOTT, Governor of the State of Texas, do hereby certify that *COVID- 19 poses an imminent threat of **disaster***. In accordance with the authority vested in me by Section 418.014 of the Texas Government Code, *I hereby declare a **state of disaster** for all counties in Texas.*[5]

26. On March 13, an order[6] was issued by Judge Ruben Becerra of Hays County, Texas, which includes the city of San Marcos, the wedding destination. The order prohibited all travel unless for purposes deemed essential. Further, the order mandated that members of the public remain at their residential homes during specific hours.

27. Plaintiff would have had to drive through the cities of Dallas, Waco and Austin, Texas to reach San Marcos.

28. On March 13, news broke that the Austin-Travis County Health Authority is taking legal action against those ordered to quarantine in their homes. An article from Austin news channel

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html
[5] https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19
[6] *See* **Exhibit C**, Hays County Order.

KXAN News, titled "*Violating a COVID-19 quarantine order could get you 6 months in jail*," stated that the Medical Director of the Austin-Travis County Health Authority can sign an order known as a "control order" over any person who the Authority believes someone "is ill with, has been exposed to, or is the carrier of a communicable disease," the authority's Medical Director, Dr. Mark Escott, can sign an order keeping those people held inside their homes for up to 14 days.[7] The article also read:

> State law allows local health authorities to issue the orders — which include criminal charges and fines. The Texas Health and Safety Code shows a violation of an order is punishable by up to six months in jail and a $2,000 fine. The crime is a Class B misdemeanor.
> A judge could also order 'involuntary incarceration in a treatment facility,' according to the copy of an order obtained by KXAN.

29. When Plaintiff booked the trip accommodations through VRBO on in January, neither she nor any reasonable person in her situation could have foreseen the outbreak of a worldwide viral pandemic that would unfold at a rapid rate over the following months. The only significant information known by, or available to, Plaintiff or any other U.S. citizens was that the sudden public health emergency was labeled as "global" and of "international concern."[8]

30. Indeed, when Plaintiff booked her trip on January 27, no declarations of disaster or emergency had been made by any U.S. state and the World Health Organization had not yet assigned a

---

[7] Jody Barr, Mar 13, 2020 | KXAN News | *Violating a COVID-19 quarantine order could get you 6 months in jail* https://www.kxan.com/news/coronavirus/violating-a-quarantine-order-could-get-you-6-months-in-jail/ (last accessed Aug 13, 2020).

[8] To present-day U.S. citizens, a global health emergency (or, alternatively, a public health emergency of international concern ("PHEIC") may be a graspable concept in theory, but in actuality would not be appropriately considered a relatable or fully comprehensible familiarity. Prior to the 2020 outbreak of the novel coronavirus in the United States swept disease across the nation in a way that directly affected U.S. citizens like never before, as only five global health emergencies had ever been declared by the World Health Organization. Further, most of those previous PHEIC declarations had been of little concern to the United States specifically. For example, the 2014 Ebola outbreak centered in West Africa, and the Zika virus outbreak centered primarily in Brazil, which reported approximately 1.3 million estimated cases. Even as recently as less than one year ago in 2019, the World Health Organization declared the 2018-19 Ebola outbreak as a PHEIC, yet still it was hardly a topic of conversation in the U.S. because it centered in the Democratic Republic of Congo. *See https://time.com/5774747/coronavirus-who-public-health-emergency/* (last visited Aug 6, 2020).

name to the novel coronavirus (now "COVID-19"). Plaintiff's January 27 booking date was also weeks before the first COVID-19 death was reported in the US on February 29, when Washington became the first state to declare emergency.[9]

31.  On March 14, Plaintiff went online to submit her second payment.[10] Upon checkout, Plaintiff was presented with the option to purchase additional travel insurance. In light of then-present disaster declarations and other orders and guidelines from the President and all other levels of government, Plaintiff opted to purchase the insurance protection for her trip and received a Policy. *See* **Exhibit D**, CSA Policy Confirmation (3.14.2020).

## Plaintiff's Trip Cancellation

32.  The events that unfolded in March eventually caused the wedding ceremony to be cancelled on March 27; moreover, because of such events, Plaintiff's accommodations were inaccessible to her.

## Defendants' Complete Denial of Plaintiff's Claims as an Insured Policyholder

33.  On March 27, Plaintiff contacted through the owner of the San Marcos trip accommodations in hopes of a full refund but did not hear back. *See* **Exhibit E**, Cancellation Request (3.27.2020).

34.  On April 1, Plaintiff submitted a Claim under the Policy using the online "eClaims portal" at https://homeaway-travel-us.eclaims.csaclaims.com/. *See* **Exhibit F**, CSA Claim (4.1.2020).

---

[9] Rosie Perper, Ellen Cranley, and Sarah Al-Arshani, *Almost all US states have declared states of emergency to fight coronavirus — here's what it means for them* (Mar. 17, 2020, 12:34 AM), https://www.businessinsider.com/california-washington-state-of-emergency-coronavirus-what-it-means-2020-3?op=1 (last visited Aug. 6, 2020). *See also* https://www.governor.wa.gov/news-media/inslee-issues-covid-19-emergency-proclamation (Feb. 29, 2020) (detailing Washington Governor Jay Inslee's declaration of emergency).

[10] Plaintiff paid through VRBO in two installments; she paid the first payment upon booking and the second payment was due on March 20.

35. On May 19, Plaintiff received a denial letter by email, which stated that the reason for denial was because "the cause of [Plaintiff's] loss is not due to an event that is covered by the plan [she] purchased." *See* **Exhibit G**, Denial Email (3.19.2020).

36. Defendants have denied Plaintiff's Claim, refusing to cover her losses due to her trip cancellation despite the fact that that the cause of her cancellation is a "covered event" under Defendants' Policy.

37. The Policy provides coverage for Trip Cancellation, among other events.

38. The Trip Cancellation Benefit Rider states:

> Benefits will be paid, up to the amount in the Schedule, for the forfeited, prepaid, non-refundable, non-refunded and unused published Payments that you paid for your Trip, <u>if you are prevented from taking your Trip due to one of the following unforeseeable Covered Events that occur before departure on your Trip</u> to you or your Traveling Companion, while your coverage is in effect under this Policy.

### **"Covered Events" Under the Policy**

### *Inaccessible Accommodation Coverage*

39. The Policy's lists the following item (hereinafter "Inaccessible Accommodations Coverage") under "Covered Events:"

> <u>Your Accommodations at your destination made inaccessible</u> due to fire, flood, volcano, earthquake, hurricane <u>or other natural disaster</u>. We will only pay benefits for losses occurring within 15 calendar days after the event renders the destination inaccessible. <u>For the purpose of this coverage, inaccessible means your Accommodations can not be reached by your original mode of transportation.</u> Benefits are not payable if the event occur or if a hurricane is named prior to or on your Trip Cancellation Coverage Effective Date.[11]

40. Due to the COVID-19 pandemic, the President of the United States officially approved declarations of disaster for Texas, Plaintiff's domicile and trip destination. The President also, in declaring the pandemic a "national emergency," invoked the Robert T. Stafford Disaster

---

[11] Policy, p. 16.

Relief and Emergency Assistance Act, 42 U.S.C. § 5121 *et seq.*, which is the statutory authority for most federal disaster response activities. The President's Disaster Relief Fund, managed by FEMA, is used to fund various "disaster assistance programs."

<p style="text-align:center">***Quarantine Coverage***</p>

41. Further, the Policy's "Covered Events" specifically provide for coverage in the event of "Being hijacked or Quarantined," and "Quarantine" *is* a Defined Term set forth in the Policy and stated specifically as follows: "QUARANTINE means the enforced isolation of your or your Traveling Companion, for the purpose of preventing the spread of illness, disease or pests."

<p style="text-align:center">**<u>Generali's Blanket Denial of All Claims Filed as a Result of COVID-19 Effects</u>**</p>

*42.* Generali, in "A Message to [their] Customers About Coronavirus," stated:

> <u>As of January 29, 2020, the Coronavirus (COVID-19) outbreak was considered a foreseeable event</u>. Consequently, any event(s) related to COVID-19 for all new travel policies purchased on or after January 29, 2020[12] may thereby be excluded in accordance with the terms and conditions of the Policy.  <u>In addition, there will be no coverage for COVID-19 related losses occurring on or after March 11, 2020</u>, the date COVID-19 was formally declared a pandemic by the World Health Organization. Please note, our plans will not cover fear of travel. Customers are strongly encouraged to read their Description of Coverage or Insurance Policy (https://www.qeneralitravelinsurance.com/retrieve-policy.html) for details regarding their available coverage.

***See*** **Exhibit H,** Generali COVID-19 Notice.

43. Despite unambiguous language in the policy, which is a fully integrated insurance agreement, Defendants breached the policy by failing to indemnify Plaintiff for the losses she incurred as a result of the forced cancellation of her travel plans due to a covered event.

---

[12] While this condition is inapplicable to Plaintiff because she purchased her Policy in 2019, it does apply to potentially thousands of Class Members who will be subject to the condition due to their date of Policy purchase.

## V. CLASS ALLEGATIONS

44. Pursuant Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiff brings this action on behalf of herself and all others similarly situated, and seeks to represent the following class:

45. All persons located within the United States that purchased Generali insurance plans accompanied by the Policy and were prevented from taking a trip as a result of a covered event during the COVID-19 pandemic who have incurred out of pocket Trip Cancellation expenses.

46. Excluded from the class are Defendants, any entities in which Defendants have a controlling interest, any of the officers, directors, or employees of the Defendants, the legal representatives, heirs, successors, and assigns of the Defendants, anyone employed with Plaintiff's counsels' firms, any Judge to whom this case is assigned, and his or her immediate family.

47. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. Due to the nature of the insurance involved, the members of the Class are geographically dispersed throughout the United States. While the exact number of Class members is information not readily available at this time, as only Generali possesses the data to determine a numerical figure to indicate the Policies sold throughout the US that have resulted in myriad claims Generali has received from consumers who would qualify as Class Members for purposes of this action, Plaintiff has reasonable belief that there are thousands of potential members in the Class. Generali states on its website that it has a presence in 50 countries in the world and

12

earned a total premium income in excess of € 69.7 billion (approximately $80 billion) in 2019, serving 61 million customers worldwide.[13]

48. **Typicality.** Plaintiffs' claims are typical of the claims of the other members of the Class she seeks to represent because Plaintiff and all Class members purchased identical coverage from Generali containing identical language regarding Trip Cancellation and Covered Events, and all Class members have been improperly denied coverage.

49. **Adequacy.** Plaintiff has retained counsel experienced in complex class action and insurance litigation. Plaintiff has no interests which are adverse to or in conflict with other members of the Class. Plaintiff will fully and adequately protect the interests of all members of the Class.

50. **Commonality.** The questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, namely: whether the events caused by the emergence of the COVID-19 pandemic constitute Covered Events under the Policy; whether the effects of any stay-at-home directives, "stop the spread" initiatives, or any other national health or safety warnings issued as a result of the COVID-19 pandemic that precluded Class Members from embarking upon or completing trips for which they purchased Policy coverage, trigger Covered Events under the Policy's terms; and whether the Policy requires Generali to reimburse Policy holders for expenses incurred as a result of trip cancellation due to events caused by the COVID-19 pandemic national disaster.

51. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of

---

[13] https://www.generali.com

the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

52. The interest of the members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class is cohesive, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the Class are uniform and generally formulaic, and the expense and burden of individual litigation could preclude them form fair redressal of the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

## COUNT I: BREACH OF CONTRACT

53. The preceding paragraphs are incorporated by reference as if fully alleged herein.

54. Plaintiff and the class purchased insurance from Defendant and were thereupon issued the Policy.

55. The Policy is a valid and enforceable contract between Generali and all policyholders, including Plaintiff and class members.

56. Plaintiff and the class members substantially performed their obligations under the terms of the Policy and Class Policies.

57. Plaintiff and the class members suffered losses from events that should be reimbursed as results of Covered Events under the Policy.

58. Defendants have failed to compensated Plaintiff and class members for their respective losses as required by the Policy.

59. As a direct and proximate result of Defendant's breaches, Plaintiff and the class have sustained damages that are continuing in nature in an amount to be determined at trial.

## COUNT II: DECLARATORY AND INJUNCTIVE RELIEF

60. The preceding paragraphs are incorporated by reference as if fully alleged herein.

61. An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other, concerning the respective rights and duties of the parties under the Policy.

62. Plaintiff contends that Generali has breached the Policy by failing to timely pay Class Members for their respective losses for covered damages.

63. Plaintiff, therefore, seeks a declaration of the parties' respective rights and duties under the Policy  and requests the Court to declare Generali's conduct unlawful and in material breach of the Policy so as to avoid future controversies that would allow for continual injustices such as the one at issue here, where huge insurance companies take advantage of masses of consumers.

64. Pursuant to a declaration of the parties' respective rights and duties under the Policy and Class Policies, Plaintiff further seeks an injunction enjoining Defendant (1) from continuing to engage in conduct in breach of the Policy; and (2) ordering Defendant to comply with the terms of the Policy, including payment of all amounts due to each respective class member under the stated Policy coverages that were extended to them upon purchase.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against Defendant as follows:

(a) That the Court enter an order certifying the class, appointing Plaintiff as a representative of the class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

(b) For a judgment against Defendant for the causes of action alleged against it;

(c) For compensatory damages in an amount to be proven at trial;

(d) For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy and Class Policies;

(e) For appropriate injunctive relief, enjoining Defendant from continuing to engage in conduct related to the breach of the Policies;

(f) For pre-judgment and post-judgment interest at the maximum rate permitted by law;

(g) For Plaintiff's attorneys' fees;

(h) For Plaintiff's costs incurred; and

(i) For such other relief in law or equity as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

August 13, 2020                                  Respectfully submitted,


                                                 BURNETT LAW FIRM

                                                 /s/ Riley L. Burnett Jr.
                                                 Riley L. Burnett, Jr.
                                                 Texas Bar No. 3428900
                                                 Karen H. Beyea-Schroeder
                                                 Texas Bar No. 24054324
                                                 3737 Buffalo Speedway, 18th Floor
                                                 Houston, Texas 77089
                                                 Karen.schroeder@rburnettlaw.com
                                                 Telephone: (832) 413-4410

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing with the Clerk of the Court by using the e-filing system. I also certify that the foregoing document will be served, via transmission of Notices of Electronic Filing upon service of Plaintiff's Original Class Action Complaint.

<div style="margin-left: 50%;">

/s/ Riley L. Burnett Jr.

Riley L. Burnett, Jr.
Texas Bar No. 3428900
Karen H. Beyea-Schroeder
Texas Bar No. 24054324
BURNETT LAW FIRM
3737 Buffalo Speedway, 18th Floor
Houston, Texas 77089
Karen.schroeder@rburnettlaw.com
Telephone: (832) 413-4410

</div>